## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:

PHILIP A. D'ANDREAMATTEO, JR.,

     Debtor.

Case No. 6:10-bk-16071-ABB
Chapter 7

_____/

DEBORAH PARONE,

     Plaintiff,

Adv. Pro. No. 6:10-ap-00247-JAF

v.

PHILIP A. D'ANDREAMATTEO, JR.,

     Defendant.

_____/

## MEMORANDUM OPINION AND ORDER

This proceeding came before the Court on the Second Amended Complaint to Determine Non-Dischargeability of Debt (Doc. No. 37) filed by the Plaintiff Deborah Parone against the Defendant/Debtor Philip A. D'Andreamatteo, Jr. ("Debtor") seeking a nondischargeability determination pursuant to 11 U.S.C. Sections 523(a)(4) and 523(a)(6). The final evidentiary hearing was held on December 8, 2011 at which Plaintiff, the Debtor, and their respective counsel appeared.

Judgment as a matter of law is due to be entered in favor of the Debtor and against Plaintiff pursuant to Federal Rule of Civil Procedure 50(a) and Federal Rule of Bankruptcy Procedure 9023. The Court makes the following Findings of Fact and Conclusions of Law after reviewing the pleadings and evidence and hearing live testimony and argument.

## FINDINGS OF FACT

The Debtor filed a Chapter 7 bankruptcy case on September 9, 2010 and listed Plaintiff as an unsecured creditor in Schedule F for debts in the amount of $15,000.00 relating to a homeowner's insurance claim and $5,000.00 for attorney's fees awarded in the parties' divorce proceeding. Plaintiff filed a three-count complaint against the Debtor asserting the debts relating to the homeowner's insurance claim are nondischargeable pursuant to Sections 523(a)(4)(Count One) and 523(a)(6)(Count Two) of the Bankruptcy Code and the $5,000.00 for attorney's fees is nondischargeable pursuant to § 523(a)(15)(Count Three) of the Bankruptcy Code. Count III was previously adjudicated pursuant to the Order entered on February 22, 2011 (Doc. No. 30).[1] The remaining Section 523(a)(4) and Section 523(a)(6) causes of action were litigated at the December 8, 2011 evidentiary hearing.

## A.    PLAINTIFF'S CASE IN CHIEF

Plaintiff has the burden to establish the elements of her nondischargeability causes of action by a preponderance of the evidence. In her case in chief, Plaintiff presented documentary evidence, admitted into evidence as Exhibits 1 through 7, and the testimony of herself, her cousin Diane Garzino, and the Debtor. Plaintiff established the following facts in her case in chief.

### *The Parties' Relationship*

Plaintiff and the Debtor were married in February 1998 and had a daughter who is now thirteen years old and severely disabled. During their marriage, the parties resided in a home Plaintiff had purchased prior to the marriage located at 521 Lake Charm Court, Oviedo, Florida 32765 (the "Oviedo Property"). The Debtor, at the time of their marriage, owned, and continues to own, a property located at 1435 Brook Drive, Titusville, Florida 32780 ("Titusville Property")

---

[1] This Court held the $5,000.00 attorney's fee award entered in favor of the Plaintiff and against the Debtor in the divorce proceeding is nondischargeable pursuant to 11 U.S.C. Section 523(a)(15).

titled solely in his name. The parties executed an Antenuptial Agreement to protect their individual ownership interests in their properties. The Antenuptial Agreement sets forth the Oviedo Property was solely the property of Plaintiff.[2] The parties have always considered the Oviedo Property to be the Plaintiff's property and the Titusville Property to be the Debtor's property.

The parties' relationship from its beginning was turbulent with long periods of separation during which the Debtor lived at the Titusville Property. The Debtor has a violent temper and on several occasions physically assaulted Plaintiff. Plaintiff obtained a restraining order against the Debtor in 2002. The parties reconciled and the 2002 restraining order was dissolved.

After an acutely violent assault against Plaintiff in May 2005, witnessed by their young daughter, the Florida State Court issued a temporary restraining order against the Debtor on June 5, 2005.[3] The temporary restraining order became a permanent injunction pursuant to the Final Judgment of Injunction entered by the Florida State Court on July 6, 2007.[4] The injunction remains in effect against the Debtor.

Plaintiff, shortly after the temporary restraining order was issued in June 2005, instituted divorce proceedings against the Debtor. The parties were divorced in July 2007 pursuant to the Amended Bifurcated Final Judgment of Dissolution of Marriage with Reservation on Other Matters.[5] Plaintiff is the primary residential parent of the parties' daughter pursuant to the terms of the divorce decree.[6]

---

[2] The Property was refinanced during the marriage and the title was mistakenly changed to a joint tenancy. The error was corrected by the Debtor's execution and issuance of a quitclaim deed to Plaintiff re-titling the Oviedo Property solely in Plaintiff's name.
[3] Plaintiff's Ex. 7.
[4] Id.
[5] Plaintiff's Ex. 2.
[6] Plaintiff's Ex. 3.

Plaintiff and her daughter continue to reside at the Oviedo Property. The Debtor resides at the Titusville Property. Plaintiff and the Debtor, pursuant to the terms of the divorce decree and the injunction, have minimal involvement with one another. Their only communications concern the care of their daughter and their only contact is during the exchange of their daughter, where the parties meet at the Oveido Police Station.

### Joint Checking Account

The Debtor, in 2002 while the parties were married, opened an individual checking account with Washington Mutual Bank titled solely in his name.[7] He converted the checking account to a joint account with Plaintiff on November 18, 2004, which the parties owned as joint tenants with the right of survivorship ("Joint Account").[8] Both the Debtor and Plaintiff were signatories on the account and agreed that only the signature of one account owner was required for transactions.[9] They also agreed that: "Depositor and each owner or signer, if more than one, appoints each other his attorney-in-fact to endorse, cash or deposit, any checks or drafts payable to the order of any one or more of them."[10] The monthly Joint Account statements were mailed to the Titusville Property.

### Hurricane Damage

In August 2004, during a period when the parties were reconciled and living together at the Oviedo Property, the Oviedo Property suffered significant exterior and interior wind damage from Hurricane Charley. Plaintiff made a claim under her homeowner's insurance policy. The insurance company paid Plaintiff $30,063.57 on the claim through the issuance of two checks: (i) check dated February 3, 2005 in the amount of $9,563.57; and (ii) check dated February 7,

---

[7] Plaintiff's Ex. 1 (Individual/Joint Master Account Agreement).
[8] Id.
[9] Id.
[10] Id.

2005 in the amount of $20,500.00.[11] Plaintiff deposited the first check into the Joint Account on February 7, 2005 and the second on February 14, 2005.[12]

The Debtor, at some point after the insurance claim was made, but before the insurance money was received, suggested to Plaintiff that he repair the Oviedo Property because licensed home repair contractors would be unavailable due to the hurricane aftermath and it would be less costly if the Debtor did the repairs. The Debtor is not in the home repair or construction business; he is a mechanic and is not skilled in home repairs. Plaintiff agreed to the Debtor's suggestion, but asserts she agreed only after he "browbeat her," without further explanation as to what she meant by that phrase.

The parties did not delineate or document the terms of the Oviedo Property repair agreement. Plaintiff understood the repairs would be done "quickly" and "to her satisfaction." They set no deadline or timetable for the Debtor's completion of the repairs. They did not itemize what repairs were to be made or how much the Debtor was to be paid for his labor. Plaintiff did not agree to pay the Debtor a bonus for his efforts.

The Debtor commenced work by removing a portion of the roof. Disagreements immediately arose between the parties over the repairs and their relationship quickly deteriorated. Plaintiff testified the Oviedo Property repair "was a power struggle almost immediately." The Debtor frequently threatened to cease doing the repairs.

In addition to the roof repair, other repairs were undertaken by the Debtor including plastering, re-screening, and drywall installation. He performed some work himself and some work was performed by contractors he hired, including Mike Shimshock and three or four day

---

[11] Plaintiff's Ex. 1. Plaintiff's insurance company issued the claim payouts to Countrywide Home Loans, Inc., the Plaintiff's mortgage company, and Countrywide issued the two checks to Plaintiff, which she endorsed and deposited into the Joint Account.

laborers. No written documents were presented regarding the engagement of these third parties, work orders, or the supplies utilized. Plaintiff was present at the Oviedo Property when the contractors were working.

Tensions between the parties increasingly rose. Plaintiff was constantly dissatisfied with the progress and quality of the Debtor's work. The Debtor stopped working on the Oviedo Property at some unspecified point, possibly in March or April 2005, leaving much of the repair work unfinished and the Oviedo Property in disrepair.[13]

Some contractor work was still ongoing after the Debtor stopped work. The contractors made repairs to the front and back porches while Plaintiff was present. Plaintiff contacted the Debtor by telephone to advise him he needed to pay the men because she had no funds to pay them. The Debtor paid the men.

The Debtor did not complete the roof, which resulted in severe leaking that further damaged the interior of the Oviedo Property.[14] Plaintiff asserts the Debtor had no intention of completing the repairs and purposefully left the Oviedo Property in disrepair.

### *Joint Account Withdrawals*

Plaintiff reviewed the Joint Account bank statements in April 2005 and discovered the Debtor had withdrawn $38,403.99 from the Joint Account. Plaintiff asserts: (i) the Debtor withdrew the funds immediately after the insurance payout checks were deposited; (ii) the funds constitute insurance proceeds that were to be used solely for repairs to the Property; and (iii) the Debtor wrongfully used the funds for personal use, including the purchase of two used cars. Plaintiff sought recovery of the funds in the divorce proceedings, but that court declined to

---

[12] Id.
[13] Plaintiff's Exs. 5, 6.
[14] Id.

adjudicate the matter within the divorce on the basis the recovery action constituted a separate civil matter.

Plaintiff instituted a civil action against the Debtor in Florida State Court in 2008 seeking the recovery of the withdrawn funds.[15] She pled quantum meruit and civil theft causes of action. The parties eventually entered into a settlement agreement whereby the Debtor agreed to pay and Plaintiff agreed to accept $15,000.00, with such amount to be paid over time through monthly installment payments of $250.00. The Florida State Court approved and ratified the settlement agreement pursuant to the Order on Motion for Summary Judgment entered on October 21, 2009.[16] The October 21, 2009 Order does not contain any findings of fact or conclusions of law. It has no res judicata or collateral estoppel effect regarding the bankruptcy nondischargeability action.

The Debtor did not fulfill the terms of the settlement agreement. He has not made any payments to Plaintiff. Plaintiff has not completed any of the Property repairs because she has been waiting for the Debtor to return the funds. The Property remains in the same state of disrepair as it existed in early 2005.[17]

Plaintiff asserts the Debtor deliberately damaged the Property by promising to repair it when he had no intention of completing any repairs. Plaintiff asserts the Debtor wrongfully withdrew the insurance proceeds from the Joint Account and used those funds for his personal benefit. She contends, based upon the Debtor's failure to fulfill the settlement agreement, the full amount of $38,403.99 is owed to her and such debt is nondischargeable.

---

[15] Debtor's Ex. 1. The amount sought by Plaintiff in the civil action was $38,670.90, which amount is slightly more than the amount of $38,403.99 at issue in this adversary proceeding. The discrepancy is unexplained.

[16] Id.

### *Testimony of Diane Garzino*

Plaintiff presented her cousin Diane Garzino as a witness. Ms. Garzino testified that: (i) she had witnessed the Debtor's verbalized anger towards Plaintiff; (ii) she was familiar with the condition of the Oviedo Property both before the hurricane and after the hurricane; (iii) the Debtor had not completed the repairs and the Oviedo Property is in substantially the same condition today as it was at the time the Debtor stopped working on it; and (iv) the Debtor commented to her he was delaying repairing the Oviedo Property to irritate Plaintiff.

Ms. Garzino, knowing the Debtor is not a home repair specialist and that he and Plaintiff were in a dispute over the repair of the Oviedo Property, hired him, without Plaintiff's knowledge, sometime in early 2005 to assist her with a wall removal project in her home. He completed the project satisfactorily and she paid him.

### *Testimony of the Debtor*

Plaintiff presented the Debtor as her third and final witness. The Debtor testified he had always intended to complete the repairs. He admitted he did not complete the repairs, but explained he could not finish the repairs because Plaintiff had obtained a restraining order against him preventing him from returning to the Oviedo Property.

The Debtor admitted he withdrew funds from the Joint Account and spent the funds. He disputes the funds were withdrawn wrongfully and that they were used solely for his personal benefit. He asserts a substantial portion of the funds were used by the parties for living expenses, including mortgage payments and expenses incurred for Christmas in 2004. He admits he used approximately $17,000.00 of the funds to purchase two used cars for his sole benefit. He confirmed Plaintiff took withdrawals of $2,500.00 and $1,000.00 from the Joint Account and she

---

[17] Plaintiff's Exs. 5, 6.

made no other withdrawals. He testified he made verbal threats against Plaintiff "in the heat of battle," but never threatened not to complete the Oviedo Property repairs.

The Debtor testified $20,500.00 was spent by the parties on non-repair expenses—$17,000.00 was spent by the Debtor on used vehicles and $3,500.00 was spent by Plaintiff on personal expenses. He did not delineate in his testimony how the balance of $17,903.99 (the difference between $38,403.99 sought by Plaintiff and $20,500.00), was spent. Plaintiff presented as an exhibit the Debtor's Answer to Interrogatories from the Florida State Court civil action. His written answers include a one-page recital of expenses totaling $21,480.00 paid by the Debtor from the Joint Account for the repair of the Oviedo Property and the parties' joint living expenses. The itemized expenses are consistent with the repairs the Debtor and the contractors undertook, but the list lacks dates and supporting documentation.

### Joint Account Statements

The best and most reliable evidence of the Joint Account transactions are the account statements. Plaintiff presented the Joint Account statements for December 10, 2004 through March 9, 2005.[18] The statements reflect the parties did not exercise fiscal responsibility. During the months of December 2004 through February 2005, the Joint Account was overdrawn five times and two checks were returned for insufficient funds, resulting in bank charges of $210.00.

The Joint Account, as a result of the overdraft penalties, had a negative balance of -$170.34 prior to Plaintiff's deposit of the first insurance check for $9,563.77 on February 7, 2005. After the first insurance check was deposited, a withdrawal of $589.88 was made to Cingular Care Cellular, leaving a balance of $8,803.55 from the insurance proceeds.[19]   On

---

[18] Plaintiff's Ex. 1.

[19] This balance takes into account the payment of the January 13, January 21, and January 31, 2005 overdraft charges of $90.00 and check numbers 480 and 482 for $74.67 and $12.45, respectively.

February 8, 2005 the Debtor deposited $12,023.75 into the Joint Account. These funds emanated from the Debtor's refinancing of the Titusville Property.[20] The Joint Account's balance after the Debtor's February 8, 2005 deposit was $20,915.31, which amount was comprised of commingled insurance and refinance funds.

The parties then made a series of withdrawals from the Joint Account:

(i)     Check No. 472 payable to Renee or Jim Williams for $1,850.00 signed by the Debtor, which check was dated December 9, 2004, but was not presented for payment until February 8, 2005.

(ii)    Check No. 487 payable to Stuckroad Auto for $750.00 signed by the Debtor, which check was dated February 3, 2005 and paid on February 9, 2005.

(iii)   Check No. 488 payable to Plaintiff for $2,500.00 signed by the Debtor, which check was dated February 7, 2005 and paid on February 8, 2005.

(iv)    Check No. 489 payable to Lowe's for $34.72 signed by the Debtor and paid on February 10, 2005.

(v)     Check No. 496 for $1,000.00 for cash signed by the Debtor and cashed on February 10, 2005.

These withdrawals resulted in a Joint Account balance of $15,697.10 as of February 10, 2005.

There was no further account activity until Plaintiff deposited the second insurance check for $20,500.00 on February 14, 2005, thereby creating a balance of $36,197.10. This balance contained commingled insurance and refinance funds. A series of withdrawals were then made in rapid succession:

(i)     February 14, 2005: Check No. 495 to Providian Card for $4,041.00.

---

[20] The Debtor received a check for $15,523.75 made payable to him individually from Traditional Title, LLC, took cash funds of $3,500.00 from the check, and deposited the balance of $12,023.75 into the Joint Account.

(ii)     February 14, 2005: Check No. 491 for $2,033.00 payable to Green Leaf
         Auto Parts signed by the Debtor.

(iii)    February 14, 2005: Check No. 493 for $311.00 payable to Capital One signed by
         the Debtor.

(iv)     February 14, 2005: Check No. 494 for $500.00 payable to Deerbrooke Insurance
         Company signed by the Debtor.

(v)      February 15, 2005: Check No. 497 to Appliance Direct for $154.30.

(vi)     February 16, 2005: Check No. 499 for $20.00 for Cash signed by the
         Debtor and endorsed on the back by the Debtor.

(vii)    February 17, 2005: Check No. 485 for $400.00 payable to Carl Wasileski
         signed by the Debtor.

(viii)   February 17, 2005: Check No. 492 for $93.94 payable to National Asset
         Recovery Service signed by the Debtor.

(ix)     February 18, 2005: Check No. 500 for $52.78 payable to Watkins Paints
         signed by the Debtor.

(x)      February 18, 2005: Check No. 502 for $5,000.00 for Cash signed by the
         Debtor and endorsed on the back by the Debtor.

(xi)     February 23, 2005: Check No. 503 for $1,300.00 for Cash signed by the
         Debtor and endorsed on the back by the Debtor.

(xii)    February 24, 2005: Check No. 486 for $13,780.00 signed by the Debtor
         made payable to Jackie's Auto Sales. This check was dated February 3,
         2005, was returned for insufficient funds, and re-presented on February
         24, 2005.

(xiii)   February 24, 2005: Cash withdrawal of $1,000.00 to Plaintiff.

(xiv)    February 24, 2005: Electronic payment to CitiFinancial for $358.04.

The next account events were deposits made by the Debtor. He deposited funds totaling $5,225.20 into the Joint Account from March 3 through March 9, 2005. The deposits were comprised of cash deposits of $4,540.00, payroll of $200.00 from Sierra Lobo, Inc., and payroll of $485.20 from Universal Studios. The Debtor then made two withdrawals: (i) check number 507 on March 3, 2005 for cash of $1,000.00; and (ii) check number 506 on March 8, 2005 for $9,010.00 to Jackie's Auto Sales.

The Debtor's two withdrawals left a balance of $1,333.52 in the Joint Account as of March 9, 2005. No bank statements were presented reflecting the status of the Joint Account post-March 9, 2005.

Only a few of the checks contain expenditure descriptions on their memo lines. The notations on check numbers 486, 491 and 506 corroborate the Debtor's testimony he purchased a used 2005 Ford Explorer and parts for approximately $15,000.00 and a second used car for $9,010.00. The Debtor stated in his Answer to Interrogatories he paid Mike Shimshack $1,500.00 for roof repairs. Check number 496 indicates the Debtor obtained cash of $1,000.00 for "Mike." Check number 494 for $500.00 payable to Deerbrooke Insurance Company corroborates the Debtor's testimony he spent approximately $600.00 for insurance for the parties' vehicles.

## B.    DEBTOR'S MOTION FOR JUDGMENT AS A MATTER OF LAW

Upon the conclusion of the Plaintiff's case in chief, Plaintiff rested and the Debtor made an *ore tenus* motion for the involuntary dismissal of Plaintiff's Second Amended Complaint. His motion constitutes a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a), which is applicable to bankruptcy proceedings pursuant to Federal Rule of Bankruptcy Procedure 9023.

Plaintiff seeks to have the indebtedness of $38,403.99 deemed nondischargeable pursuant to Sections 523(a)(4) and 523(a)(6). Plaintiff, to prevail, must establish by a preponderance of the evidence all of the elements of a Section 523(a)(4) or a Section 523(a)(6) cause of action. The cornerstone element for both causes of action is the Debtor's intent. The evidence of Plaintiff's case in chief does not establish the Debtor acted with the requisite intent to sustain either a Section 523(a)(4) or a Section 523(a)(6) cause of action.

## CONCLUSIONS OF LAW

Section 523(a) of the Bankruptcy Code sets forth exceptions to the dischargeability of debts arising from a debtor's wrongful conduct. The party objecting to the dischargeability of a debt carries the burden of proof and the standard of proof is preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291 (1991). Objections to discharge are to be strictly construed against the creditor and liberally in favor of the debtor. Schweig v. Hunter (In re Hunter), 780 F.2d 1577, 1579 (11th Cir. 1986). Plaintiff pled and presented Section 523(a)(4) and Section 523(a)(6) causes of action.

### Count I:  11 U.S.C. Section 523(a)(4)

Section 523(a)(4) of the Bankruptcy Code provides a debtor is not discharged from debts resulting from "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Plaintiff pled in Count I of her Second Amended Complaint the withdrawn funds of $38,403.99 were obtained by the Debtor "by fraud or defalcation while committing larceny . . ."[21] Plaintiff did not specifically plead whether her Section 523(a)(4) count is based upon fiduciary defalcation, larceny, or embezzlement. Plaintiff, in open Court, asserted the evidence presented establishes a prima facie showing of embezzlement and larceny.

---

[21] Doc. No. 37, ¶ 12.

Accordingly, Plaintiff's Count I, is not a fiduciary defalcation cause of action, but contains embezzlement and larceny causes of action.

Embezzlement and larceny constitute separate Section 524(a)(4) causes of action and do not require a finding of fiduciary capacity. In re Pupello, 281 B.R. 763, 767-68 (Bankr. M.D. Fla. 2002). A plaintiff, however, must establish, as a prerequisite, fraud or fraudulent intent. In re Kelley, 84 B.R. 225, 231 (Bankr. M.D. Fla. 1988).

"Embezzlement" is defined for dischargeability purposes as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." Id. (quoting Moore v. U.S., 160 U.S. 268, 269 (1895)). The threshold element in a Section 523(a)(4) embezzlement cause of action is fraudulent intent, which "may be negated by a showing that the defendant used such funds openly and without concealment." Id. A plaintiff must also establish the property at issue was the plaintiff's property. In re Tomlinson, 220 B.R. 134, 136 (Bankr. M.D. Fla. 1998).

Larceny constitutes the fraudulent taking of another's property with the intent to convert it without the other's consent. In re Pupello, 281 B.R. at 768. Larceny differs from embezzlement in that the original taking of the property must be unlawful. Id. The Florida Courts define the common law tort of conversion as "the exercise of wrongful dominion or control of the property to the detriment of the rights of its actual owner." United Am. Bank of Cent. Fla., Inc. v. Seligman, 599 So. 2d 1014, 1017 (Fla. 5th DCA 1992).

### Count II: 11 U.S.C. Section 523(a)(6)

Section 523(a)(6) of the Bankruptcy Code provides any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is nondischargeable. 11 U.S.C. § 523(a)(6). Plaintiff must establish by a preponderance of the evidence the injury

was intentional—that the Debtor not only intended the act or omission, but also the injury which resulted. Kawaauhau v. Geiger, 523 U.S. 57, 61-62 (1998); In re Vestal, 256 B.R. 326, 329 (Bankr. M.D. Fla. 2000).

A plaintiff, to prevail in a Section 523(a)(6) action, must establish that a debtor acted or failed to act "willfully." Id. An act which is intended or which is substantially certain to cause injury, satisfies the "willful" requirement of Section 523(a)(6). Hope v. Walker (In re Walker), 48 F.3d 1161, 1165 (11th Cir. 1995). A malicious act is an act which is "wrongful and without just cause or excessive even in the absence of personal hatred, spite, or ill-will." Id. at 1164. This Court employs the substantial certainty test in adjudicating Section 523(a)(6) matters. In re Vestal, 256 B.R. at 329.

### Motion for Judgment

The Debtor's motion made at the close of Plaintiff's case in chief for the dismissal of the Second Amended Complaint constitutes a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50. U.S. Anchor Mfg., Inc. v. Rule Indus., Inc., 7 F.3d 986, 992 n.9 (11th Cir. 1993). Rule 50(a) is applicable to bankruptcy proceedings pursuant to Federal Rule of Civil Procedure 9023. Fed. R. Bankr. P. 9023(a); In re Diagnostic Instrument Grp., Inc., 283 B.R. 87, 93 (Bankr. M.D. Fla. 2002). "[A] trial court must direct a verdict if under the governing law there can be but one reasonable conclusion as to the verdict." In re Diagnostic, 283 B.R. at 93.

### A.    ANALYSIS

#### 1.    Creation of the Joint Account

Plaintiff insinuated in her testimony that the Joint Account was created with fraudulent intent by the Debtor. She neither pled nor presented any details or specific evidence of any

fraudulent intent involving the creation of the Joint Account. She did not assert the Debtor threatened her to open the Joint Account or that it was opened under duress.

The record is devoid of any evidence establishing, or even suggesting, the Debtor engaged in wrongful conduct regarding the creation of the Joint Account. The Joint Account was not created contemporaneously with Plaintiff's receipt of the insurance checks, but was created on November 18, 2004—almost *three months prior* to Plaintiff's receipt of the first insurance check in February 2005.

Plaintiff did not give up an individual bank account or any rights in the creation of the Joint Account. The Debtor transformed *his* personal checking account into a jointly owned account with Plaintiff. Plaintiff voluntarily executed the Master Account Agreement and thereby became a joint owner of the account entitled to all the benefits that flow from joint ownership. The Debtor obtained no benefit individually from the conversion of his checking account into a joint account. The conversion benefited both parties. They pooled their funds into the Joint Account thereby allowing one another the use of those funds.

The Debtor and Plaintiff each had unfettered access to the Joint Account funds pursuant to their contractual agreement. They, as set forth in the Master Account Agreement, agreed only one signatory was required to conduct transactions on the account. They designated one another as the attorney-in-fact for the other "to endorse, cash or deposit any checks or drafts payable to the order of any one or more of them."[22] Each had the power to withdraw all or part of the funds in the Joint Account pursuant to the Master Account Agreement.

If Plaintiff had reservations about the Debtor's intentions regarding his use of the Joint Account, she could have required two signatures for transactions, but she did not. Likewise, if she questioned the Debtor's motives she should have carefully monitored the account. She did

not timely review the monthly account statements. The withdrawals Plaintiff complains of were made beginning in February 2005, but Plaintiff testified she did not learn of the withdrawals until she reviewed the bank statements in April 2005. Had Plaintiff truly been concerned about the Debtor's intentions regarding the Joint Account, she would have monitored the account on a regular basis. Additionally, the banking records reflect Plaintiff maintained a separate individual bank account into which she deposited funds from the Joint Account. If she believed the insurance proceeds to be at risk, she could have deposited them into her individual account.

### 2.    Joint Account Deposits

The parties pooled their funds by making deposits into the Joint Account. Plaintiff deposited the insurance funds totaling $30,063.57 in February 2005 and the Debtor made deposits from December 23, 2004 through March 9, 2005 totaling $18,805.23. The Debtor's deposits were not insubstantial, with the largest being $12,023.75 derived from the refinancing of the Titusville Property.

The Debtor's deposits are significant for two reasons. First, the deposits negate Plaintiff's assertion the Debtor created the Joint Account and withdrew funds with fraudulent intent. The Debtor contributed his own funds to the Joint Account thereby giving Plaintiff access to those funds. A large portion of those funds were derived from the Debtor's individually owned, non-marital property—the Titusville Property. He, by depositing the refinance funds into the Joint Account, transformed them into marital property. If the Debtor had fraudulent intentions regarding the Joint Account, he would not have deposited his funds into the Joint Account.

Second, the Debtor's deposits created a pooling of funds in the Joint Account. The parties' deposited funds were commingled. Where two parties own a bank account as joint

---

[22] Plaintiff's Ex. 1, Master Agreement ¶ 2.

tenants with the right of survivorship, "each person has the right, against the other, only to his or her individual interest in the account." NationsBank, N.A. v. Coastal Utilities, Inc., 814 So. 2d 1227, 1229 (Fla. 4th DCA 2002). "[F]unds in the account belong to the parties in proportion to the net contributions by each to the sums on deposit." Joseph v. Chanin, 940 So. 2d 483, 486 (Fla. 4th DCA 2006).[23]  Where a joint account owner "wrongfully appropriates more than his share of the money from a joint tenancy account," he may be liable for conversion pursuant to Florida law. Id.  The tracing of funds is central to a conversion action.  Plaintiff presented no tracing analysis in support of her allegations against the Debtor.

Plaintiff's assertion the Debtor wrongfully appropriated $38,403.99 from the Joint Account is contradicted by the documentary evidence.  First, Plaintiff's allegation is numerically impossible.  She only deposited $30,153.57 into the account, so the Debtor could not have taken $38,403.99 of her funds.

Second, the chronology and nature of the account transactions establishes the Debtor did not wrongfully take $38,403.99, or any amount, from the Joint Account.  In December 2004, the insurance funds did not yet exist and all transactions on the Joint Account involved funds deposited solely by the Debtor.  The Debtor could not have wrongfully withdrawn any monies in December 2004 because all of the funds on deposit originated from him.

The Debtor's December 2004 deposits were fully expended and no further funds flowed into the Joint Account until February 7, 2005 when Plaintiff deposited the first insurance check for $9,653.57 and immediately thereafter the Debtor deposited the refinance proceeds of $12,023.75.  The Debtor's proportional interest in the Joint Account exceeded Plaintiff's proportional interest at this point.  From these deposits total withdrawals of $5,777.00 were made

---

[23] For purposes of alienation, the shares in a joint bank account are presumed to be equal. Beal Bank, SSB v. Almand & Assocs., 780 So. 2d 45, 53 (Fla. 2001).

by the parties, including a cash withdrawal of $2,500.00 made by Plaintiff, thereby reducing her proportional share. The Debtor's withdrawals did not exceed or even come close to his proportional share of the funds.

The next deposit was the second insurance check for $20,500.00 on February 14, 2005. At this point Plaintiff's proportional share of the Joint Account was $27,653.57, which exceeded the Debtor's share. Plaintiff immediately withdrew cash of $1,000.00, thereby reducing her proportional share of the account funds. The Debtor deposited $5,225.20, which increased his proportional share. Most of the withdrawals made from February 14, 2005 through March 9, 2005 (the statement's closing date) were for household expenses or Oviedo Property repairs and not for the Debtor's personal benefit.

The Debtor admitted some of the withdrawals were for his personal benefit including $13,780.00 to Jackie's Auto Sales and $2,033.00 to Green Leaf Auto Parts for the Ford Explorer, and $9,010.00 to Jackie's Auto Sales for another used car. Those withdrawals total $24,823.00 and exceeded the Debtor's proportional share in the Joint Account at the close of the March 2005 statement by approximately $7,000.00.

While the Debtor's withdrawals for the vehicles exceeded his proportional share, Plaintiff did not establish those withdrawals, or any withdrawals made by the Debtor, were made wrongfully. The Debtor, pursuant to the Master Account Agreement, had contractual authority to make all of the withdrawals he made on the Joint Account. He made the withdrawals openly and without concealment.

In short, the bank statements evidence the Debtor could not have wrongfully appropriated $38,403.99 of the Plaintiff's funds because she did not contribute funds in that amount to the Joint Account. There was no immediate taking of the insurance funds by the Debtor as Plaintiff

suggests. The insurance funds were deposited in February 2005 and commingled with the Debtor's deposits. The pooled funds were drawn down over time by both parties through February and March 2005, but not fully depleted. $1,333.52 remained in the account as of March 9, 2005.

The vast majority the account withdrawals were for the parties' joint living expenses or for repair of the Oviedo Property. Plaintiff presented no evidence establishing the Debtor acted wrongfully or with fraudulent intent regarding the Joint Account. She presented no evidence establishing the Debtor willfully withdrew any funds to cause malicious injury to Plaintiff.

### 3.    The Repairs

The Debtor's actions regarding the Oviedo Property further evidence the absence of fraudulent intent. The Debtor agreed to repair the Property and he took action to fulfill that agreement. The bank account records, specifically the checks issued to Lowe's, reflect the Debtor began working on the Oviedo Property in December 2004—almost two months before Plaintiff received the insurance checks.

The Debtor continued to work on the Property until at least the end of March or early April 2005. He hired contractors to assist him with the repairs. Work continued even when the Debtor had suffered an injury to his arm. The banking records show costs incurred by the Debtor for supplies and labor costs. Plaintiff witnessed the work performed by the Debtor and the contractors. She knew the contractors were not working for free.

The Debtor stopped working on the Oviedo Property due to the parties' marital dispute. Even after he stopped working, he made arrangements for the contractors to work on the porches and he paid them. It appears the Debtor fully paid all of the contractors for their labor since no

mechanic's or materialmen's liens were presented. He could not return to the Oviedo Property due to the restraining injunction.

## Conclusion

The record is devoid of any evidence of fraudulent intent or deceit by the Debtor regarding the Joint Account or the Oviedo Property repairs. He did not create the Joint Account or appropriate any funds from it with fraudulent intent. He did not commit embezzlement, larceny, or conversion. He did not injure Plaintiff or her property by any willful and malicious act.

Plaintiff presented insufficient evidence in her case in chief to establish the nondischargeability elements of either 11 U.S.C. Section 523(a)(4) or Section 523(a)(6). Plaintiff has not established a debt of $38,403.99, or in any amount, is nondischargeable pursuant to 11 U.S.C. Section 523(a)(4) or Section 523(a)(6). The Debtor's motion for judgment as a matter of law is due to be granted pursuant to Federal Rule of Civil Procedure 50(a) and Federal Rule of Civil Procedure 9023. Any and all debts owed by Debtor to Plaintiff relating to the Joint Account or the Oviedo Property are dischargeable and are due to be discharged.

Accordingly, it is

**ORDERED, ADJUDGED and DECREED** that the Debtor's *ore tenus* motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) and Federal Rule of Bankruptcy Procedure 9023 is hereby **GRANTED**; and it is further

**ORDERED, ADJUDGED and DECREED** that the relief sought in Counts I and II of the Plaintiff's Second Amended Complaint (Doc. No. 37) is hereby **DENIED** and any indebtedness owed by the Debtor to Plaintiff relating to the Joint Account or Oviedo Property is **DISCHARGEABLE** pursuant to 11 U.S.C. Sections 523(a)(4) and 523(a)(6).

A separate Judgment consistent with these Findings of Fact and Conclusions of Law shall be entered contemporaneously.

Dated this 25 day of January, 2012 in Jacksonville, Florida.

JERRY A. FUNK
United States Bankruptcy Judge